## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## LONDON DIVISION

IN RE:

**CASE NO. 13-61501**
**Chapter 7**

MANALAPAN MINING COMPANY, INC.
DEBTOR

### TRUSTEE'S MOTION TO APPROVE ASSIGNMENT OF LEASE
### FREE AND CLEAR OF LIENS PURSUANT TO 11 U.S.C. SECTION 363

Comes James R. Westenhoefer, trustee, and respectfully moves the Court for a Order approving the assignment of Lease free and clear of all liens and encumbrances pursuant to 11 U.S.C. Section 363.

In support of this Motion the trustee represents as follows:

1. On January 1, 2004 the debtor, Manalapan Mining Company, Inc. entered into a lease with Pocahontas Development Corporation of Bluefield, West Virginia. (An exact copy of this lease is attached as Exhibit A.)

2. Kingdom Coal II, LLC, through Montana Bakken, LLC has previously taken over certain permits and been assigned the 1992 mining lease between Black Star Land & Mining LTD, and R.B. Coal Company (which was merged into the debtor, Manalapan Mining Company, Inc. January 28, 1997).

3. Kingdom Coal II, LLC has made an offer of Five Thousand and no/100 Dollars ($5,000.00) for the assignment of the lease.

4. The debtor has not assumed this lease and there are numerous defaults which must be cured.

5. E. Forrest Jones, attorney for Pocahontas Development Corporation, has expressed the desire to negotiate directly with Kingdom Coal II, LLC. (Exhibit B)

4.    Through negotiations the sales price will be $10,000, with no out of pocket expenses to the estate.

WHEREFORE, The Chapter 7 Trustee respectfully moves the Court for an Order approving the sale to Kingdom II, LLC "as is, where is," subject to all liens and encumbrances.

Respectfully submitted,

/s/ James R. Westenhoefer,
JAMES R. WESTENHOEFER, TRUSTEE
212 South Third Street
Richmond, Ky 40475
(859) 624-0145

## NOTICE AND OPPORTUNITY TO OBJECT

All parties shall take notice that unless the Court receives an objection to this Motion for Approval of Sale of Real Estate in Lee County, Virginia within twenty-one (21) days of the date of this notice, the Court will enter an order approving this sale without further notice to creditors and parties in interest.  Any objection shall be filed with the U.S. Bankruptcy Court Clerk, served upon the trustee and noticed by the objecting party to be heard before the U.S. Bankruptcy Court, London, Kentucky.

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Trustee's Application was served by electronic notice and/or by placing same in the U.S. Mail, postage prepaid, addressed to the Debtors, Debtors' attorney, U.S. Trustee's Office and all creditors and other parties in interest as listed upon the mailing matrix, on this the 16th day of November, 2017.

/s/ James R. Westenhoefer,
JAMES R. WESTENHOEFER, TRUSTEE

THIS LEASE, Made as of January 1, 2004, between **POCAHONTAS DEVELOPMENT CORPORATION**, a corporation of Kentucky, with a mailing address of Post Office Box 1517, Bluefield, West Virginia 24701, Lessor, and **MANALAPAN MINING COMPANY, INC.**, a corporation of Kentucky, with a mailing address of Post Office Box 311, Brookside, Kentucky 40801, Lessee;

<u>W I T N E S S E T H</u>:

IN consideration of the sum of Ten Dollars ($10.00) cash, receipt of which is acknowledged, and the performance and observance of the terms and provisions hereinafter set forth to be performed and observed by Lessee, and reserving as rent the royalties, rentals and all other payments hereinafter provided for, Lessor hereby leases to Lessee, for the period of five (5) years from the date hereof through December 31, 2008, subject to termination or extension for additional five (5) year periods until all the coal which can be economically mined and removed has been mined and removed and the reclamation thereof has been finally approved by the state and/or federal agency or agencies which now have or shall hereafter have jurisdiction or control of such mining operations, and all the bonds therefor have been fully released, all as hereinafter provided in ARTICLE XX hereof, the sole and exclusive right of mining and removing, by any method of mining, the Pathfork Seam of coal and all seams above the Pathfork Seam, except the Harlan Seam, within a parcel of land, containing 5,057.31 acres, more or less, situated in Harlan County, Kentucky, on the waters of Puckett Creek and Path Fork of same, and on Brownies Creek and Martins Fork of Cumberland River, and being more fully shown by red border on map attached hereto and made a


EXHIBIT
A

part hereof and marked in the lower right-hand corner thereof: "Pocahontas Development Corporation, Bluefield, West Virginia, No. 2270-G, Aug. 31, 2005, JEH."

Said 5,057.31 acres, are made up of different tracts or parcels of land in which Pocahontas Development Corporation owns the fee, less the Harlan Seam of coal, timber, oil and gas; mineral less Harlan Seam, oil and gas; and 5/8 undivided interest in fee, less timber, oil and gas, and which for convenience of designation are as follows (the areas given being by estimation only and are not to be construed as a warranty of acreage):

## TABLE OF AREA
### Harlan County, Kentucky

| Tract or Parcel out of which area is taken | Fee | Area in Acres Min. | Total |
|---|---|---|---|
| Pt. Tract No. 64 – Nathan Bradford | | | |
| "192.50 ac." | 27.05* | - | 27.05 |
| Pt. Tract No. 65 – Joshua R. Howard | | | |
| "181.60 ac." | 0.79* | - | 0.79 |
| Tr. No. 69 | 32.44* | - | 32.44 |
| Tr. No. 70 – Stephen Green | 86.54* | - | 86.54 |
| Tr. No. 71 – L. B. Saylor and George W. Lee | | | |
| "258.50 ac." | 245.00* | 0.47 | 245.47 |
| Tr. No. 72 – C. H. Davis "1.50 ac." | 1.50* | - | 1.50 |
| Tr. No. 73 – L. B. Saylor"197.00 ac." | 197.00* | - | 197.00 |
| Tr. No. 74 – Elizabeth Jane Rice | | | |
| "49.60 ac." | 33.83* | - | 33.83 |
| Tr. No. 75 – Malinda E. Rice | 10.40* | - | 10.40 |
| Tr. No. 76 – J. B. Rice | 4.15* | - | 4.15 |
| Tr. No. 77 – William Robert Rice | | | |
| "22.80 ac." | 22.09* | - | 22.09 |
| Tr. No. 78 – Daniel L. Owens | 18.50* | - | 18.50 |
| Tr. No. 79 – James B. Rice | | | |
| "40.00 ac." | 40.00* | - | 40.00 |
| Tr. No. 80 – W. B. Lawson | | | |
| "218.00 ac." | 101.54* | - | 101.54 |

2

| | | | |
|---|---|---|---|
| Tr. No. 81 – Burton Hensley | | | |
| "231.20 ac." | 214.48* | - | 214.48 |
| Tr. No. 82 – David Shackelford | | | |
| 10th Tract | 149.80* | - | 149.80 |
| Tr. No. 83 – Jerry K. Saylor & Nathaniel | | | |
| L. Daniel "172.70 ac." | 172.70* | - | 172.70 |
| Tr. No. 84 – J. S. Forester | | | |
| 5/8 undivided interest | 17.70** | - | 17.70 |
| Tr. No. 85 – Levi B. Saylor | | | |
| "26.50 ac." | 26.50* | - | 26.50 |
| Tr. No. 86 – Wilson Saylor | | | |
| "40.30 ac." | 40.30* | - | 40.30 |
| Tr. No. 87 – Jerry K. Saylor | | | |
| "67.50 ac." | 67.50* | - | 67.50 |
| Tr. No. 88 – Thomas Moore | | | |
| "115.50 ac." | 115.50* | - | 115.50 |
| Tract No. 89 – R. R. Moore | 58.40* | - | 58.40 |
| Tract No. 90 – C. H. Davis | | | |
| "27.80 ac." | 27.80* | - | 27.80 |
| Tract No. 91 – William Craig & Granville | | | |
| Smith "135.80 ac." | 135.80* | - | 135.80 |
| Tract No. 92 – Granville Smith | | | |
| "354.70 ac." | 321.57* | - | 321.57 |
| Tract No. 93 – Thomas Rice | | | |
| "57.90 ac." | 57.90* | - | 57.90 |
| Tract No. 94 – Isaac Daniel | | | |
| "75.20 ac." | 75.20* | - | 75.20 |
| Tract No. 95 – Charles Hall | | | |
| "75.00 ac." | 75.00* | - | 75.00 |
| Tract No. 96 – William R. Taylor | | | |
| "210.00 ac." | 155.13* | - | 155.13 |
| Tract No. 97 – Phillip M. Daniel | | | |
| "147.10 ac." | 147.10* | - | 147.10 |
| Tract No. 98 – John Tipton Heirs | | | |
| "180.00 ac." | 180.00* | - | 180.00 |
| Tract No. 99 – Bascom Daniel | | | |
| "84.60 ac." | 84.60* | - | 84.60 |
| Tract No. 100 – J. D. & R. H. Lee | | | |
| "99.20 ac." | 99.20* | - | 99.20 |
| Tract No. 101 – William A. Lee | | | |
| "43.50 ac." | 43.50* | - | 43.50 |

3

| | | | |
|---|---|---|---|
| Tract No. 102 – David Lee<br>"188.80 ac." | 100.20* | - | 100.20 |
| Tract No. 103 – Joshua Taylor - 7th Tract<br>"39.10 ac." | 39.10* | - | 39.10 |
| Tract No. 104 – William A. Lee - 9th Tract<br>"84.00 ac." | 84.00* | - | 84.00 |
| Tract No. 105 – W. F. Hall - 9th Tract<br>"98.80 ac." | 98.80* | - | 98.80 |
| Tract No. 106 – Enos S. Howard<br>"119.30 ac." | 119.30* | - | 119.30 |
| Tract No. 109 – C. E. Fulkerson<br>Tract No. 1 | 157.53* | - | 157.53 |
| Tract No. 110 – C. H. Davis<br>"3.50 ac." | 3.50* | - | 3.50 |
| Tract No. 115 – Taylor and Crate<br>"2,821.40 ac." | <u>1,367.49*</u> | <u>0.41</u> | <u>1,367.90</u> |
| **Total** | 5,056.43 | 0.88 | 5,057.31 |

\*      Fee, less the Harlan Seam of coal, timber, oil and gas is owned by Pocahontas Development Corporation.

\*\*      5/8 Undivided Interest Fee, less timber, oil and gas, is owned by Pocahontas Development Corporation.

The fee, less the Harlan Seam of coal, timber, oil and gas, of 3,463.36 acres, more or less, of said 5,057.31 acres, is included in the tract returned for taxes by Pocahontas Development Corporation on the Land Book of said Harlan County, for the tax year 2005 and generally charged as Tract No. 158-HR-02; 3,463.36 acres fee, less the Harlan Seam, timber, oil and gas.

The 5/8 undivided interest in fee, less timber, oil and gas, of 17.70 acres, more or less, of said 5,057.31 acres, is so charged as Tract No. 111-HR-08; 17.70 acres 5/8 undivided interest in fee, less timber, oil and gas; LICK BR. OF PATH FORK.

The fee, less the Harlan Seam of coal, timber, oil and gas, of 1,575.37 acres, more or less, and the mineral, less the Harlan Seam of coal, oil and gas, of 0.88 of an acre, more or less, of

4

said 5,057.31 acres, is so charged as Tract No. 158-HR-04; 1,575.37 acres fee, less the Harlan Seam,

timber, oil and gas; 0.88 of an acre mineral, less the Harlan Seam, oil and gas; PATHFORK, CY BR,

HURRICANE BR, WHITE SOW BR, PUCKETT.

The lands above described are part of the same lands included in deed dated August

26, 1980, recorded in said Harlan County in Deed Book No. 244, page 401, from Kentenia

Corporation to said Pocahontas Development Corporation.

**SUBJECT, However, to the rights of:**

(a)      Maggard Mining, Inc., under lease dated December 7, 2001, not recorded,

from Pocahontas Development Corporation;

(b)      Others in the oil, gas, timber and surface not owned by Pocahontas

Development Corporation;

(c)      Kentucky Power Company for rights-of-way for electric power transmission

lines and appurtenances as may now be located and in use;

(d)      The Commonwealth of Kentucky and the public for public roads as may now

be located and in use;

(e)      Others in any and all transmission lines, pipelines, rights-of-way, structures,

easements and restrictions as may or may not appear of record;

(f)      CSX Corporation for railroad rights-of-way as now located and in use; and

(g)      The public, United States of America, Commonwealth of Kentucky, riparian

owners and others, if any, in and to the beds and streams of any and all waterways, tributaries and

5

other drainage systems which may be included within the boundaries of said 5,057.31 acres, more or less.

**THE RIGHTS HEREIN LEASED** are limited to such as Lessor possesses and has the lawful right to lease and to such as Lessor owns under the deeds covering said properties or said coal and appurtenant rights, and it is agreed that Lessor does not warrant its title to the leased properties or any portion thereof. However, upon the assertion of an adverse claim to any portion of the leased properties, Lessor shall render all assistance possible to Lessee in defense against such adverse claim. It is further agreed that, if a court decree (after exhaustion of appeals) or by agreement of the parties hereto it is determined that the adverse claim is valid and such adverse claim is of such nature that Lessor does not have sufficient title to such portion of said leased properties to permit Lessee's mining of the coal therein, then, to the extent the Lessee has paid royalties to Lessor on coal mined in such portion, such royalties shall be refunded to Lessee.

**EXCEPTING AND RESERVING, HOWEVER,** from this lease, and to the Lessor all seams of coal other than those herein leased and the entire ownership of the properties herein described, and all of the other minerals and mineral substances, and other products of every kind and description therein and thereon, together with the right to mine, remove and take away the entire amount and body thereof, for all purposes other than those for which this lease is made; **PROVIDED, HOWEVER,** that exercise of the ownership and rights so excepted and reserved shall not unreasonably interfere with the requirements, convenience and safety of operations of Lessee.

Lessor and Lessee recognize the importance of environmental protection and the necessity of proper ecological balance, and, to further these objectives, Lessee agrees to conduct all

6

operations hereunder with utmost caution and in compliance in every respect with all applicable laws of the Commonwealth of Kentucky and the United States of America now existing or hereafter enacted, and all rules and regulations promulgated thereunder, to preserve conditions as nearly as possible as they presently exist by altering the topography and interfering with or impeding watercourses as little as possible.

IT IS UNDERSTOOD, however, that the properties included in this lease are in an area committed to the mining and removal of coal and other minerals and that coal mining operations and other enterprises have been and are now being conducted by a lessee or lessees of Lessor in, upon and under the surface of the properties above described and in the general vicinity thereof, and, as one of the considerations for this lease, Lessee shall indemnify and save harmless Lessor, its officers, agents and employees, and its successors and assigns, and its or their lessees, from all claims and damages or other relief, caused by or resulting from, directly or indirectly, any unnatural condition upon or under said properties and/or adjacent lands of Lessor as a result of such mining or other activities. IT IS A CONDITION HEREOF, that Lessee, its successors and assigns shall have no claim or right of recovery against Lessor, its successors and/or assigns, and its or their lessees, for any such damage. It is the intention hereof that said properties are hereby leased to Lessee, AS IS, IN THEIR PRESENT CONDITION and subject to the rights of others as hereinabove set forth.

THIS LEASE is subject to the following terms and provisions which Lessee covenants with Lessor to perform and observe, viz:

# ARTICLE I

## COVENANT TO DEVELOP; PERMITTING

Section 1.1. <u>Development</u>. Lessee shall at all times diligently and energetically open, develop and maintain operations within the leased properties in order that so long as fair prices are obtainable its capacity for mining, preparing and shipping coal shall be sufficient to meet the demands and requirements of the market to the extent that the same can reasonably be done hereunder; and Lessee shall report promptly in writing to Lessor any suspension of operations, reasons therefor and expected duration thereof.

Section 1.2. <u>Permitting</u>. Lessee agrees that upon execution of this lease, it will, in its name and at its expense, promptly commence the necessary procedures with the appropriate state and/or federal agencies having jurisdiction of such mining operations and obtain and maintain in effect the requisite permit or permits for the conduct of such mining operations. Lessee also agrees to continue with subsequent required permitting procedures with said state and/or federal agencies to the end that the mining operations contemplated under this lease shall be continuous, insofar as possible under applicable laws, and the regulations promulgated thereunder, until all the coal herein leased, which can be mined and removed by such mining methods as Lessor may approve, has been mined and removed. In the event this lease shall be terminated or canceled for any reason prior to completion of operations hereunder and Lessee shall have obtained the requisite permit or permits for the conduct of such mining operations from such agencies, then Lessee hereby covenants and agrees that it shall promptly, upon request of Lessor, assign and/or otherwise transfer said permit or permits, pursuant to K.R.S. 350.010, et seq., to such other party or parties as Lessor may designate.

8

## ARTICLE II

## PRODUCTION ROYALTY

Section 2.1. <u>Amount of Royalty</u>. Lessee shall pay to Lessor as rent a royalty of six

percent (6%) of the average gross selling price per net ton, as hereinafter defined, for coal mined

hereunder, calculated and reported on a monthly basis.

Section 2.2. <u>Reporting of Quantity of Coal Mined</u>. Lessee shall, on or before the

fifteenth (15th) day of each calendar month, furnish to Lessor a written report, certified as to

correctness by such agent as Lessee may designate having personal knowledge of the facts, showing

the quantity of coal mined hereunder during the immediately preceding calendar month, with the

specific mines and seams designated, using as a basis railroad weights of all coal shipped by railroad

and ascertaining the quantity of all other coal mined hereunder in a manner satisfactory to the Vice

President of Lessor, or such person or persons as the Vice President shall designate (hereinafter

"Vice President"); and Lessee shall comply with any further rules and regulations for the accurate

ascertainment and report of the quantity of coal mined hereunder and the selling price thereof that

may reasonably be prescribed by said Vice President.

In the event Lessee shall mix coal produced hereunder with other coal prior to

shipment, Lessee shall comply with such reasonable rules and regulations as the Vice President of

Lessor shall from time to time prescribe for the purpose of ascertaining with reasonable accuracy the

quantity of coal produced hereunder.

Section 2.3. <u>Date of Payment of Royalty; Interest</u>. On or before the twentieth (20th)

day of each calendar month, Lessee shall pay Lessor for the coal mined hereunder during the

9

immediately preceding calendar month at the higher rate set forth in Section 2.1 above. Lessee will pay interest to Lessor on any royalty amounts due and not paid by the twentieth (20th) day of the calendar month at the rate of one and one-half percent (1 1/2%) per month from the date said amounts are due.

Section 2.4. Calculation of Royalty; Gross Selling Price Defined. For the purpose of calculating the royalty provided for above, the term "gross selling price" as used herein shall mean the actual gross sales for the month applicable to Lessor's tonnage, less any sales tax imposed thereon, divided by the actual tons sold for the month to a bona fide purchaser, calculated on a mine by mine basis, if practicable. This average gross selling price assumes the sale occurs, f.o.b. the initial outbound loading point after preparation, if any, or, if not first transported to a preparation facility, the actual price paid for the coal, assuming the sale occurs, f.o.b. the outbound loading point on the leasehold, less any sales tax imposed thereon, but without deduction for selling commissions, advertising, credit losses, or other expenses, but with deduction for discounts or allowances actually allowed to arms-length wholesalers; provided, however, that if Lessor gives notice to Lessee in writing that, in Lessor's reasonable judgment, a particular purchaser is not a bona fide purchaser, Lessor may elect to substitute for the gross selling price paid by that purchaser the prevailing market price of such coal as reasonably determined by Lessor and based upon recent sales by Lessee and others of coal of comparable quality to bona fide purchasers; provided further, that for any coal consumed on or off the leased properties without sale by Lessee the gross selling price for the purpose of computing the royalty shall be the prevailing market price, as determined above, of such

10

coal at the time of shipment from the leased properties or, if used on the leased properties, at the time of use.

The term "bona fide purchaser" as used herein shall mean a purchaser who pays valuable consideration in good faith without intending to take unfair advantage of any third parties, including Lessor, but in no case shall that phrase include persons or parties affiliated with Lessee, either directly or through any joint ownership.

Section 2.5. <u>Unmined or Lost Coal</u>. Tonnage royalty which may be owed by Lessee for coal in place left unmined or rendered unmineable or that may be lost or destroyed on the leased properties as provided in Section 7.1 hereof shall be based on the prevailing market price, as determined above, of such coal, if properly sized and cleaned, at the time when such coal should have been mined or at the time when such coal is lost or destroyed, as may be appropriate under the terms of this lease.

## ARTICLE III

## <u>ADVANCE MINIMUM ANNUAL RENTAL</u>

Section 3.1. <u>Amount and Payment: Interest</u>. Lessee shall pay to Lessor, as advance minimum annual rental on account of coal mined or to be mined hereunder, the sum of Fifty Thousand Dollars ($50,000.00) commencing with calendar year 2005 and Fifty Thousand Dollars ($50,000.00) for each calendar year thereafter under this lease and extensions thereof, provided that minimum annual rental for 2005 shall be prorated as of September 15, 2005. Payment of advance minimum annual rental shall be made on or before January 1st of each calendar year, except that advance minimum annual rental for 2005 shall be paid upon execution of this lease.

11

Lessee will pay interest to Lessor on the amount of any advance minimum annual rental due and not paid by the date such rental is due at the rate of one and one-half percent (1 1/2%) per month from the date said amounts are due.

Section 3.2. Recoupment. Each payment of advance minimum annual rental shall be applied as a credit, first against production royalties payable for mining performed in the calendar year for which such payment of advance minimum annual rental is made and then, to the extent not recouped by such credit against production royalties earned during that calendar year, against those production royalties earned in the next two (2) succeeding calendar years which exceed the amount of the advance minimum annual rental paid for that year. It is understood and agreed that no advance minimum annual rental paid for any calendar year shall be credited against production royalties more than once.

Section 3.3. Failure to Perform: Excuse. In the event of unavoidable interruption of or delay in its operations in any calendar year of this lease, due to strikes, accidents, inadequate car supply, or causes of like character not within the control of Lessee, at the end of that calendar year Lessee shall be reimbursed that percentage of its payment of advance minimum annual rental which is equal to the percentage of that year in which Lessee's operations are delayed because of any such causes. However, the parties hereto recognize and agree that the potential for depressed markets for the sale of coal or coal products, whether such conditions are regional in nature or more widespread, and increased production costs are business risks contemplated by operators and miners and sellers of coal, and, therefore, neither the existence of a depressed market for the sale of coal or coal products, nor increased or high costs of mining coal experienced by Lessee, nor any combination

12

thereof shall constitute grounds for or be deemed to be interpreted as a basis for release from payment of advance minimum annual rental under Section 3.1 hereof.

Section 3.4. Modification of Minimum Rental. Whenever, in the opinion of the Vice President of Lessor and such agent as Lessee may designate, the quantity of unmined coal remaining which Lessee is or has become obligated to mine has been reduced or depleted so as to justify a modification, reduction, or suspension of advance minimum annual rental, such advance minimum annual rental may be modified, reduced, or suspended as the Vice President of Lessor may in his sole discretion permit, and Lessee shall mine the same at the rate of tonnage royalty provided for in ARTICLE II above.

## ARTICLE IV

### LESSEE'S RECORDS; INSPECTION

4.1. Lessee shall keep books of account, at the mine or at such other place as Lessor may approve in writing, to ascertain: the quantity of coal mined; the quantity of coal used at the mines; the quantity of coal shipped; and the selling prices obtained for all coal mined hereunder. Said books shall be open at all reasonable times for inspection by Lessor or its agents for the purpose of comparing and verifying the reports rendered by Lessee under ARTICLE II hereof or for obtaining information as to the quantity of coal mined, the quantity of coal used at the mines, the quantity of coal shipped and the selling prices obtained.

4.2. Upon request, supporting documentation pertaining to said books of account, such as coal sales contracts, purchase contracts, invoices, lessee work papers and any other supporting documentation considered necessary to Lessor's inspection hereunder shall be made

13

available to Lessor for review, copying and reproduction, if considered necessary, in order to document and confirm the information contained in the books of account described in the preceding Section 4.1. The contents of such documentation shall be treated as confidential information by Lessor and shall not be disclosed to any person or entity not a party to this lease, except as provided by relevant state or federal laws.

## ARTICLE V

## ENVIRONMENTAL LIABILITIES

Section 5.1. Lessee shall be responsible for any pollution of air, lands or water resulting from coal and coal products, slack, dirt, slate and other waste materials deposited by it on the properties above described, or arising or resulting from Lessee's operations hereunder, and Lessee shall indemnify and save harmless Lessor, its officers, agents and employees, from all claims, demands, prosecutions, fines, and judgments against Lessor, its officers, agents or employees, by reason of any such pollution and shall pay all costs and expenses incurred by Lessor, its officers, agents or employees, in defending any such claims, demands and prosecutions. Upon request of Lessor, Lessee shall defend Lessor against any and all such claims at Lessee's expense.

## ARTICLE VI

## LESSEE'S MINING OPERATIONS

Lessee covenants that it will use due care and diligence to protect the properties and coal reserves included herein from waste, injury or damage and to that end Lessee shall conduct its operations hereunder in accordance with the terms of Sections 6.1 and 6.2 hereof.

14

Section 6.1.  <u>Mining Practices and Compliance with Laws</u>.  Lessee shall, in accordance with plans of mining and descriptions thereof approved as provided for in Section 6.2 below, but subject to the requirements of the Commonwealth of Kentucky and federal law pertaining to the conduct of the mining of coal, mine the coal within the leased properties in the safest, most effectual, most workmanlike and proper manner, and so that said mining shall not unreasonably interfere with the proper exercise of the rights hereinbefore excepted and reserved to Lessor; and, Lessee shall comply in every respect with the laws of the Commonwealth of Kentucky and the United States of America now existing or hereafter enacted, and all the rules and regulations promulgated thereunder, relating to the conduct of operations for the mining of coal.

Section 6.2.  <u>Approval of Mining Plans</u>.  To protect the properties and coal reserves included herein from waste, injury or damage, Lessee shall mine the coal within the leased properties in accordance with plans of mining and reclamation and descriptions thereof which shall be submitted by Lessee to Lessor.  Such mining and reclamation shall not be initiated until such plans and descriptions have been approved in writing by the Vice President of Lessor.  Upon Lessor's request, Lessee shall furnish Lessor: (i) a copy of Lessee's application for the mining permit, including the reclamation plan required by the Commonwealth of Kentucky, with the maps and drawings attached thereto, and (ii) a statement of the post mining land use which is proposed to be made of the leased properties following reclamation obligations, for approval by said Vice President, prior to its being filed with the governmental agencies responsible for issuance of such mining permits.  Lessor shall use due diligence in reviewing such application and plans of mining and reclamation and descriptions thereof, and Lessor shall not withhold notice of approval or disapproval

15

for an unreasonable length of time. Notwithstanding the foregoing provisions of this Section 6.2, Lessor shall not require a higher post-mining land use and condition than the pre-mining land use and condition, unless otherwise agreed between Lessor and Lessee. No change in any such plans or descriptions so approved by said Vice President shall be made without such change being approved in advance by said Vice President, or except as required by such regulatory agencies.

## ARTICLE VII

### LESSEE'S LIABILITY FOR NONCOMPLIANCE

Section 7.1. If at any time Lessee shall not conduct operations as provided in ARTICLE VI hereof and loss of coal which Lessee is obligated to mine or loss of other coal of Lessor may thereby result or be threatened, the Vice President of Lessor shall have authority to determine where and in what particular those provisions of said ARTICLE VI are being violated, and, in the event of a failure of Lessee to cure such violation within ten (10) days of receipt of written notice from Lessor specifying such violation, to enter for Lessor and stop the work at such place until Lessee shall comply with said ARTICLE VI; and Lessee shall pay to Lessor the full amount of royalty, at the rate provided in ARTICLE II hereof, on the estimated tonnage of coal lost which Lessee is obligated to mine or that may remain unmined by reason of failure of Lessee to conduct operations as required by said ARTICLE VI, in the same manner as if said coal had been mined and removed; and Lessee shall compensate Lessor for the full amount of any other coal of Lessor that is lost by reason of the failure of Lessee to conduct operations as required by said ARTICLE VI.

16

## ARTICLE VIII

## ENGINEERING REQUIREMENTS; AUTHORITY OF VICE PRESIDENT OF LESSOR; SURVEY DATA; PRESERVATION OF SURVEY CONTROL (TRIANGULATION) STATIONS

Section 8.1.  Engineering Requirements; Authority of Vice President of Lessor. Lessee shall employ a competent engineer to make surveys, determine elevations, prepare plans and maps of the mine workings, and Lessee shall prepare and keep up, on a scale to the approval of the Vice President of Lessor, a map which shall be posted every three (3) months and shall show accurately and completely, the boundaries of the lands included herein, the locations of all railway tracks, rights-of-way, streams, roads, buildings, structures and mine workings on or under said lands, together with elevations on sea level datum on the mine workings, and any additional information that can be practically obtained and that may be necessary to the safe and proper conduct of the mining operations, or that may be required by the Vice President of Lessor.  The size of said map shall be in accordance with standards to be prescribed by said Vice President and a reproducible tracing of said map, which shall be the property of Lessor, shall be sent to said Vice President on or before the twentieth (20th) day of January, April, July and October of each year, properly posted in accordance herewith for the three (3) months ending on the last day of the calendar month immediately preceding; and said Vice President shall have the privilege of keeping said tracing a sufficient time to obtain therefrom such information as he may desire before returning the said tracing to Lessee for each subsequent posting; and Lessor and its agents shall at all times have access to the maps, plans and tracings of Lessee, and may take therefrom copies of such portions as may be desired.

17

Section 8.2. <u>Survey Data; Preservation of Survey Control (Triangulation) Stations</u>.

Upon Lessor's request, Lessee shall furnish Lessor's Vice President with a copy of all information,

including but not limited to, maps, survey field books and traverse sheets, resulting from surveying

performed on behalf of the Lessee within the leased properties. Lessee shall use due care to avoid

the destruction of survey control or triangulation stations. However, if in Lessee's operations

hereunder, it becomes necessary to destroy one of said survey control or triangulation stations, then

Lessor shall be notified at least (ninety) 90 days in advance of such destruction. If such destruction

does occur without said prior notice thereof being given to Lessor, then Lessee shall promptly

reimburse Lessor for the cost of resetting said survey control or triangulation stations.

## ARTICLE IX

## FAILURE TO FURNISH PLANS OR MAPS

Section 9.1. If Lessee fails to furnish any plan or map as provided for in ARTICLE

VIII hereof for fifteen (15) days after written demand therefor by the Vice President of Lessor, Lessor

may at its option employ a competent engineer to make surveys and to prepare such plan or map, and

Lessee shall pay to Lessor the full amount of expenses so incurred.

## ARTICLE X

## COAL FROM OTHER LANDS; LAND USE TOLL

Section 10.1. In the event Lessee transports or ships coal from any property not

owned by Lessor into, over, through or under any of the leased properties, Lessee shall pay to Lessor

fifteen cents (15¢) per net ton of that coal, or, one-half of one per cent (1/2%) of the average gross

selling price per net ton of that coal, as gross selling price is defined in Section 2.4 above, whichever

is greater, as land use toll for such transportation or shipment.  Lessee shall report and make

payment, pursuant to the provisions of Sections 2.2 and 2.3 above, for coal transported or shipped

hereunder.  Lessee will pay interest to Lessor on any land use tolls due and not paid by the twentieth

(20th) day of the calendar month at the rate of one and one-half percent (1 1/2%) per month from the

date said amounts are due.  However, Lessee shall not transport or ship coal from any property not

owned by Lessor into, over, through or under any of the aforesaid properties if Lessor serves upon

Lessee a written objection to any such transportation or shipment.  Lessor is aware that Lessee has

created an impoundment that is located on the leased properties herein; however, additional refuse or

disposal sites will not be allowed on the leased properties without the prior written consent of Lessor.

## ARTICLE XI

## **INDEMNIFICATION**

Section 11.1.  Lessee shall conduct operations hereunder on its own behalf and not as

agent or employee of Lessor and there shall be no privity of contract between Lessor and employees

of Lessee.  All employees, agents, contractors, subcontractors, and materialmen of Lessee, whether

on a wage or profit sharing basis, shall be selected, hired, directed, paid, and discharged only by

Lessee.  Lessee shall and hereby agrees to indemnify and save harmless Lessor, its officers, agents,

and employees, from and against any and all claims, demands, suits, judgments, recoveries and

liabilities for injury to or death of any person or persons whomsoever and for loss of or damage to

any property whatsoever, arising or in any manner growing out of the operations or activities of

Lessee under or in connection with this lease.  Lessee hereby further agrees to indemnify and save

harmless Lessor, its officers, agents and employees, from and against any and all penalties, fines,

19

prosecutions, statutory recoveries (whether civil or criminal, including, but not limited to, claims for wages and benefits by either the employees of Lessee or the employees of any third party who claim a lien against the leased properties pursuant to the provisions of the Kentucky Wage Payment Act, Kentucky Mechanics Lien statutes and applicable Kentucky law) and governmental actions which arise from or are occasioned by the operations or activities of Lessee under or in connection with this lease.

## ARTICLE XII

## TAXES AND ASSESSMENTS; COAL APPRAISAL REPORTS

Section 12.1.  Taxes and Assessments.  During the term of this lease and any extensions or renewals pursuant to ARTICLE XIX hereof, Lessee shall pay and bear and reimburse Lessor for the expense of all taxes and assessments of every kind and character that may be levied or assessed by governmental authority against or upon the properties included herein or Lessor's ownership thereof, including, without limitation: (i) excise, privilege or license taxes based upon the acreage of land owned by Lessor in the Commonwealth of Kentucky, any exemption of acreage therefrom to be prorated to the acreage included in this lease; (ii) ad valorem taxes; and (iii) taxes levied or assessed on the coal mined hereunder, on the privilege of mining said coal, on the improvements or other property of Lessee in or on properties above described, on the leasehold rights of Lessee, and on the income accruing to Lessee therefrom.  Within thirty (30) days of Lessee's receipt of a statement for such taxes and assessments, together with copies of corresponding paid tax tickets therefor, Lessee shall repay to Lessor the amount of any such taxes and assessments as shall be paid by Lessor.

20

Section 12.2.  <u>Method of Payment</u>.  Lessee shall pay such taxes and assessments annually to Lessor as Lessor may direct.  Adjustments for overpayment for any tax year shall be credited or billed, as the case may be, by such reasonable method as Lessor shall determine.

Section 12.3.  <u>Coal Appraisal Reports</u>.  Lessee shall submit to Lessor, for its review, a copy of annual coal appraisal reports and returns prepared pursuant to K.R.S. 132 et seq., or regulations promulgated thereunder, prior to their filing with the Kentucky Revenue Cabinet.  It is understood and agreed that the assessments and levies arising and calculated from such reports are based, in part, upon the annual production tonnages of Lessee, and for that reason, Lessee shall pay to Lessor, in the manner provided in Section 12.2 hereof, an amount equal to any increase in such assessments and levies resulting from operations upon the lands herein.  Such payments shall continue and survive any termination or cancellation of this lease until such time as said assessments and levies have returned to inactive or non-production status.  Lessee will pay interest to Lessor on any amounts due under Section 12.2 hereof and this Section and not paid within thirty (30) days after demand therefor has been made at the rate of one and one-half percent (1 1/2%) per month from the date said amounts are due.  Lessor reserves the right to pay any taxes or assessments due under this ARTICLE XII without waiving its rights for collection thereof from Lessee as provided in ARTICLES XXI and XXII of this lease.

## ARTICLE XIII

## <u>PROHIBITION AGAINST ASSIGNMENT</u>

Section 13.1.  Lessee shall not mortgage, assign, convey, sublease, or set over any of its estate, interest or rights hereunder or any part thereof, or any of its rights or interests in buildings

and other improvements placed upon the leased properties by the Lessee, except with the written

consent of Lessor and the written assumption by the transferee of all the obligations of Lessee in

form satisfactory to Lessor, with the clear understanding that such written consent may be subject to

renegotiation of the royalty rates or other provisions hereinabove set forth for coal mined from the

area, or coal seams therein, which are assigned, conveyed, subleased, or set over; **AND** no judicial or

other sale or transfer of any kind, except under order or decree issued by any court or judicial officer

or tribunal, or in compliance with any order or decree of any court of equity or in any proceedings in

bankruptcy, shall have the effect of transferring this lease or any of the estate, interest or rights of

Lessee for any time or term, except with the written consent of Lessor and the written assumption by

the transferee of all the obligations of Lessee in form satisfactory to Lessor, which consent shall not

be unreasonably withheld.

## ARTICLE XIV

## WORKERS' COMPENSATION; LESSEE'S DUTIES

Section 14.1.  Lessee shall subscribe to and operate under the provisions of the

Kentucky Workers' Compensation Act, and make all necessary payments thereto, and such coverage

shall also include drivers of any trucks which may be hired, rented or leased, and upon request

furnish to Lessor certificate of such compliance, together with paid premium receipts.

If at any time the subscription to said Workers' Compensation Act shall cease to be in

force and effect. then Lessee shall suspend, and Lessor may stop all operations of Lessee hereunder

until such subscription shall be reinstated.

**ARTICLE XV**

**BLACK LUNG BENEFITS; INDEMNIFICATION; EVIDENCE OF
FINANCIAL RESPONSIBILITY**

Section 15.1.  Lessee hereby guarantees and agrees to indemnify and save harmless

Lessor, its officers, agents and employees, from the payment of or any liability for benefits which

may be required under the Black Lung Benefits Act (30 U.S.C. 901, et seq.) and under any laws or

regulations of the Commonwealth of Kentucky, arising from any mining operations hereunder, and

Lessee agrees that during the primary period and renewals, if any, of this lease, it will furnish

annually to Lessor evidence of financial responsibility for such black lung benefits under applicable

federal and state laws, as well as regulations issued thereunder.   Such evidence of financial

responsibility shall consist of the following:

(a) in the event the Workers' Compensation law of the state (State) in
which the leased property is located has been included in the list
published by the Secretary of Labor of the United States of America
under the Black Lung Benefits Act (30 U.S.C. 901, et seq.), such
evidence shall consist of a certification from the officers
administering the Workers' Compensation program for the State
certifying as to Lessee's black lung benefits coverage under those
Workers' Compensation laws;

(b) in the event the Workers' Compensation laws of the State are not
included in the list published by the Secretary of Labor of the United
States of America under the Black Lung Benefits Act (30 U.S.C. 901,
et seq.), Lessee shall either:

(1)  qualify as a self-insurer in accordance with regulations
prescribed by said Secretary of Labor, or

(2)  insure and keep insured, with any stock company or
mutual company or association, or any other person or fund,
including any State fund, which is authorized under the laws of the
State to insure Workers' compensation, all black lung benefits payable

23

under applicable federal and state statutes and regulations issued thereunder, and furnish a satisfactory certificate to Lessor evidencing such insurance coverage.

## ARTICLE XVI

### WAGES AND BENEFITS; INDEMNIFICATION AND BOND

Section 16.1.  Lessee hereby guarantees and agrees to indemnify Lessor, its officers, agents and employees, from the payment of or any liability for, or resulting from, wages and benefits which may be due the employees of Lessee, its permitted sublessees and assigns or its/their contractors.

## ARTICLE XVII

### INSURANCE; CESSATION OF OPERATIONS

Section 17.1.  <u>Amount of Insurance</u>.  As a condition precedent to the commencement of operations hereunder, Lessee shall provide the following insurance coverages:

**Required Insurance Coverage/Limits**

| | |
|---|---|
| Worker's Compensation | Statutory |
| Employer's Liability (per accident) | $1,000,000 |
| | |
| Commercial General Liability (per Occurrence) | $1,000,00 CSL |
| Bodily Injury & Property Damage | (Combined Single Limit) |
| | |
| Automobile Liability | $1,000,000 CSL |
| Bodily Injury & Property Damage | (Combined Single Limit) |
| | |
| Excess or Umbrella Liability | $5,000,000 CSL |
| (Inclusive of above limits) | (Combined Single Limit) |

24

| Pollution Legal Liability Coverage | $5,000,000 each incident |
|---|---|
| | third party bodily injury and |
| | property damage |
| | $5,000,000 each incident |
| | on and off site clean up |

Lessor reserves the right to require certified copies of all policies. The above minimum insurance requirements are subject to review, modification, and/or change at the reasonable discretion of Lessor based on changes in lessee operations, risks or other circumstances.

## Additional Coverages/Limits

Lessor reserves the right to require Lessee to provide and maintain additional coverages in the event that the particular operations of Lessee involve unusual risks.

**A.      The Following Applies to All Policies**

1.      Lessor, its parent, subsidiaries and affiliates and their agents, directors, officers and employees, shall be included as additional insured on all policies (except Workers' Compensation coverage).
2.      All policies shall contain a Waiver of Subrogation in favor of Lessor, its parent, subsidiaries and affiliates and their agents, directors, officers and employees, and its Insurers.
3.      Lessor shall receive thirty (30) days' written notice of cancellation or any material change.
4.      Coverage under all insurance required to be carried by Lessee shall be primary insurance exclusive of any other existing valid and collectible insurance.
5.      All insurance shall be with insurers reasonably acceptable to Lessor. (Insurer shall be a licensed or registered company in the state where lessee operations are conducted and must have ratings of A-/VII or better in the Best's Key Rating Insurance Guide latest edition.)
6.      If any of the required insurance contains aggregate limits and such limits are diminished by any incident, occurrence, claim, settlement, or judgment against such insurance, Lessee shall take immediate steps to restore such aggregate limits or shall provide other insurance protection for such aggregate limits.

**B.      Workers' Compensation and Employer's Liability shall include:**

1.      Statutory Workers' Compensation for state of operation.
2.      Employer's Liability.

**C.    Commercial General Liability (Occurrence Form) shall include:**

    1.    Premises/Operations
    2.    Independent Contractors
    3.    Personal Injury
    4.    Products/Completed Operations
    5.    Blanket Contractual Liability
    6.    Explosion, Collapse and Underground Coverages
    7.    Subsidence Coverage (mining operations)

**D.    Comprehensive Automobile Liability shall include:**

    1.    Owned vehicles
    2.    Non-Owned vehicles
    3.    Hired vehicles

**E.    Excess Liability (Occurrence Form) shall comply with the Terms and   Conditions of the following underlying coverage:**

    1.    Employer's Liability
    2.    Commercial General Liability
    3.    Comprehensive Automobile Liability

**F.    Pollution Legal Liability Coverage**
    1.    Covers all leased premises

       It is understood and agreed, however, that the minimum limits of coverage set forth above are not intended and will in no manner limit the recoveries of Lessor under the indemnity provisions of ARTICLES V, XI, XV and XVI above and on page 7 of this lease.

       Section 17.2.  <u>Cessation or Suspension of Operations</u>.  If at any time any of these insurance coverages shall cease to be in force and effect, then, upon written demand of Lessor, Lessee shall suspend all operations hereunder until such insurance coverages shall be reinstated.

## ARTICLE XVIII

## LESSOR'S RIGHT TO EXAMINE MINING OPERATIONS

Section 18.1. Lessor, and the Lessor's employees, agents and engineers, shall at all times have the right and privilege of entering the works and mines of Lessee in or upon the properties included herein to examine, survey or measure the same or any part thereof solely for the purpose of verifying the reports of Lessee as to the amounts of coal mined or removed and for that purpose only to use freely the means of access to said works and mines, without hindrance or molestation.

## ARTICLE XIX

## OBLIGATION TO MINE; EXTENSION; DUTY TO RECLAIM; TERMINATION

Section 19.1. <u>Obligation to Mine; Extension</u>. Lessee shall mine and remove all of the mineable and merchantable coal which can be mined and removed hereunder by modern mining methods and if, at the expiration of the original period hereof, Lessee has not mined and removed all of the coal which it is or may become obligated to mine, then this lease shall be extended for such additional five (5) year periods as may be necessary, upon the same terms and provisions, but subject to the full payment of all royalties, rentals and other payments due hereunder, until all of said coal which can be economically mined and removed by approved mining methods has been mined and removed from the leased properties; and whenever during said original period or any extension thereof, as herein provided, Lessee shall have mined and removed all of said coal by such approved mining methods and shall have paid all royalties, rentals and other payments due or accrued

27

hereunder then Lessee's obligation to mine coal and make payment of minimum annual rental hereunder shall terminate.

Section 19.2. <u>Duty to Reclaim; Payment of Amounts Due; Termination</u>.  In the event the lease herein shall not be extended at the end of the original period hereof or any extended period thereof, or all of said coal has been mined and removed, then this lease shall continue to be extended for additional one (1) year periods, at a nominal rental to be determined by Lessor, until all the reclamation of the lands disturbed by mining operations under this lease has been completed and finally approved by the state and/or federal agency or agencies having jurisdiction of such mining operations and all the bonds for such reclamation have been fully released by such agency or agencies.  Upon such release of all of said bonds this lease shall terminate, without, however, releasing Lessee from any obligations or liabilities arising prior to said termination.  Further, in the event Lessee has not made payment of all royalties, rentals and other payments due hereunder at the end of the original period hereof or any renewal or extended period thereof, then Lessor, at its option, may extend the term of this lease until all of such payments have been made.

## ARTICLE XX

## <u>TERMINATION OF LEASE</u>

Section 20.1. <u>Termination by Lessee</u>. After Lessee's satisfaction of all mining and reclamation obligations contained in ARTICLE XIX hereof, Lessee may give Lessor thirty (30) days' notice of its intention to terminate this lease, and, if Lessor shall determine that Lessee has fully performed its obligations under this lease, Lessee's obligations hereunder shall be deemed terminated effective on such thirtieth (30th) day, without, however, releasing Lessee from any obligations or

28

liabilities arising prior to said termination of obligations. Upon termination of this lease, any advance minimum annual rental paid for the calendar year in which the termination occurs which has not been credited against production royalties shall be refunded to Lessee, and Lessee shall not be liable for any further advance minimum annual rentals.

Section 20.2. <u>Removal of Property Following Termination or Expiration</u>. Upon termination or expiration of this lease, Lessee shall have one hundred eighty (180) days in which to remove from the properties leased hereby all Lessee's equipment, buildings and other improvements and personal property, and any of the same not so removed shall, at Lessor's option, either become the property of Lessor without charge therefor or be disposed of by Lessor at Lessee's cost and expense; provided, however, that Lessee shall not remove any equipment, buildings, improvements or property unless Lessee shall have fully performed all matters to be performed by it hereunder.

**ARTICLE XXI**

**<u>DEFAULT</u>**

Section 21.1. <u>Default; Cancellation by Lessor</u>. If any one or more of the following events (herein sometimes called Events of Default) shall occur:

(a) If default shall be made in the due and punctual payment of any rent, royalty or any part thereof, when and as the same may become due and payable, or in the payment of taxes and insurance premiums or any other amounts to be borne by Lessee hereunder, or in the furnishing of receipts and certificates of payment therefor when due, or in the furnishing of any of the books, records or reports by Lessee to be

29

furnished under this lease, and such default shall continue for thirty (30) days after notice by Lessor to Lessee; or,

(b)  If default shall be made by Lessee in the performance of or compliance with any of the covenants, agreements, terms or conditions contained in this lease, other than those referred to in the foregoing subsection (a) of this Section 21.1, and such default shall continue for a period of sixty (60) days after written notice thereof from Lessor to Lessee, and Lessee shall not within such period commence with due diligence the curing of such default, or if Lessee shall, within such period, commence with due diligence to cure such default and thereafter shall fail or neglect to prosecute and complete with due diligence and dispatch the curing of such default; or,

(c)  If Lessee shall file a voluntary petition in bankruptcy or shall be adjudicated bankrupt or insolvent, or shall file any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, or liquidator of Lessee or of all or any substantial part of the property leased hereby or of any or all the rents, revenues, issues, earnings, profits, or income thereof, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due;

30

then and in any such event, Lessor at any time thereafter while such default or condition is continuing, may give written notice to Lessee specifying the occurrence giving rise to such Event of Default, or Events of Default, and stating that the lease shall terminate on the date specified in such notice, which shall be at least ten (10) days after the giving of such notice.  Upon the date specified in such notice, this lease and the estate and interest hereby demised shall terminate and all rights of Lessee under this lease shall cease.

Section 21.2.  <u>Repossession, etc. by Lessor</u>.  Lessee expressly waives any right to prior notice or any process of law other than the issuance of the warrant of distraint, and Lessee further expressly waives any right to hearing prior to the levy of such warrant and sale thereunder and at any time after such termination of this lease, Lessor, without further notice, may enter and re-enter the premises for all proper purposes and repossess itself by all legal means, including summary proceedings, of its prior and former estate and may remove Lessee and all persons claiming through Lessee from the property leased hereby.

Section 21.3.  <u>Survival of Lessee's Obligations; Damages</u>.  No termination of this lease or repossession of the property leased hereby, by force, summary proceedings, ejectment or otherwise, shall relieve Lessee of its liability and obligations under this lease, and such liability and obligations, including, without limitation, the indemnity commitments contained in ARTICLES V, XI, XV and XVI above and on page 7 of this lease, shall survive termination or any repossession.  In the event of any such termination or repossession, Lessee shall pay to Lessor the advance minimum annual rentals, production royalties and other charges payable by Lessee up to the time of such termination or repossession.

31

Section 21.4.  No Waiver, etc. by Lessor.  No failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this lease or to exercise any right, power or remedy consequent upon a breach thereof, and no acceptance of full or partial performance or payment of royalties during the continuance of any such breach, shall constitute a waiver of or consent to any such breach or of such covenant, agreement, term or condition.  No waiver of any breach shall affect or alter this lease, but each and every covenant, agreement, term and condition of this lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

Section 21.5.  Injunction Against Breach.  In the event of any breach or threatened breach by Lessee of any of the covenants, agreements, terms or conditions of this lease, Lessor shall have the right to invoke any rights, powers and remedies allowed at law, in equity or by statute or otherwise, whether or not specifically provided in this lease.

Section 21.6.  Lessor's Remedies Cumulative, etc.  Each right, power and remedy of Lessor provided for in this lease shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this lease or now or hereafter existing at law or in equity, by statute or otherwise, and the exercise or beginning of the exercise by Lessor of any one or more of the rights, powers or remedies provided for in this lease or now or hereafter existing at law or in equity, by statute or otherwise shall not preclude the simultaneous or later exercise by Lessor of any or all other rights, powers or remedies provided for in this lease, or by statute or otherwise.

32

## ARTICLE XXII

## CONDEMNATION

Section 22.1. If the coal herein leased, or any portion thereof, shall be taken in, or in any manner affected by, condemnation for any public or quasi-public use under any statute or by right of eminent domain, or by private purchase in lieu of condemnation, by a public body vested with the power of eminent domain, then, and in each and every such event, Lessor shall be free to conduct all negotiations for compensation or damages, including without limitation, participation in viewer's proceedings and the institution of litigation concerning such taking, with the understanding that in the case of each and every condemnation or taking Lessor shall notify Lessee of same, and Lessor and Lessee shall be paid out of any such award or compensation in damages as follows:

(a) If the award for the coal in any such condemnation or taking shall exceed the amount of royalty that would have been due Lessor had the coal been then mined, based upon recent sales by Lessee or, if no such sales exist, based upon recent sales by others of coal of comparable quality, all of such award which is in excess of said royalty amount shall be the property of and be paid to Lessee and the balance of the award shall be the property of and be retained by Lessor; or,

(b) If such award for the coal shall be equal to or less than said royalty amount, then all of such award shall be the property of and be retained by Lessor.

(c) Any specific award for Lessee's buildings, structures or improvements shall be paid to Lessee and any award for surface lands, or interests therein or any other buildings. structure or improvements thereon, shall be the property of Lessor.

33

Lessee shall cooperate with Lessor in all matters hereunder, including joining in any litigation or settlement if Lessor determines such to be necessary; provided, that any such condemnation or taking shall not otherwise affect Lessee's duties and obligations under this lease, except as provided herein.

## ARTICLE XXIII

## ARBITRATION

Section 23.1. If there should arise any matters in dispute hereunder on which Lessor and Lessee cannot finally agree, such matter or matters shall be referred to a board of arbitrators consisting of three (3) disinterested, competent persons, one selected by Lessor and one by Lessee, as hereinafter provided, and the two thus selected shall select the third, who shall have the power of an umpire and be known as umpire-arbitrator. The decision and award of such arbitrators, or any two of them, or, in case of disagreement among all the arbitrators, of the umpire-arbitrator, shall be conclusive and binding upon Lessor and Lessee and promptly complied with.

The party desiring arbitration shall give written notice to the other party, definitively stating the point or points in dispute and naming the person selected as arbitrator; and it shall be the duty of the other party, within fifteen (15) days after receiving such notice, to name an arbitrator, and these two shall select the umpire-arbitrator; and in event the party notified does not name an arbitrator within said period of fifteen (15) days, the party serving such notice may select a second arbitrator and the two thus selected shall select the umpire-arbitrator.

In the event of failure of the two arbitrators, selected as aforesaid, within thirty (30) days from receipt by both of them of notice of their selection, to agree upon the umpire-arbitrator,

34

then they shall jointly notify, in writing, the parties of their failure to agree upon such umpire-arbitrator. The parties shall then, within fifteen (15) days from the date of such notification, jointly select the umpire-arbitrator. In the event the parties are unable to so select the umpire-arbitrator within said fifteen (15) day period, they shall then jointly select the names of three (3) potential umpire-arbitrators. None of these three (3) potential umpire-arbitrators shall represent, or have any affiliation with either party. Once the list of said three (3) potential umpire-arbitrators has been prepared, each party shall then strike the name of one (1) potential umpire-arbitrator from said list. The person remaining on such list after the parties have stricken a name from said list shall be the umpire-arbitrator. Further, in the event the parties fail to select such umpire-arbitrator as aforesaid, either of the parties may apply to the American Arbitration Association (AAA) for the appointment of an umpire-arbitrator pursuant to the rules and procedures of the AAA for the appointment of neutral arbitrators, as revised. The individual then designated will act as such umpire-arbitrator hereunder.

The umpire-arbitrator thus chosen shall give to Lessor and Lessee written notice as to the time and place of hearing, which hearing shall be not less than ten (10) nor more than twenty (20) days after his selection, and, at the time and place appointed he shall proceed with the hearing unless, for some good cause of which the arbitrators shall be the judge, it shall be postponed until some later date within a reasonable time. Both Lessor and Lessee shall have full opportunity to be heard, orally and in writing, on any question thus submitted. In arriving at a decision and award, the arbitrators shall be bound by any relevant state and federal law applicable to the substantive issue or issues so submitted for arbitration, and they shall make such decision and award in writing, and deliver a copy

35

to both Lessor and Lessee. The arbitration award shall specify by whom the costs of arbitration shall be borne and paid and the amount of·such costs, including reasonable compensation for the arbitrators.

## ARTICLE XXIV

## CONTROLLING LAW

Section 24.1. In all coal mining operations and other activities conducted hereunder Lessee shall comply with all the laws of the United States of America and the Commonwealth of Kentucky now or hereafter enacted, and all rules and regulations promulgated thereunder by any governmental agency, relating to such coal mining operations or other activities. Any disputes as to the meaning and application of any of the provisions of this lease shall be determined under the laws of the Commonwealth of Kentucky.

## ARTICLE XXV

## NOTICE

Section 25.1. The giving of any notice to, or the making of any demand on, Lessee shall be sufficient if in writing, addressed to Lessee and mailed via certified mail, providing for receipt, to Lessee at Post Office Box 311, Brookside, Kentucky 40801; and likewise the giving of any notice to, or the making of any demand on, Lessor shall be sufficient if in writing, addressed to Lessor and similarly mailed via certified mail, providing for receipt, to Lessor at P. O. Box 1517, Bluefield, West Virginia 24701; and ten (10) days shall be considered a reasonable notice or demand period except where a longer notice period is herein prescribed.

36

## ARTICLE XXVI

### HEADINGS

Section 26.1.  The headings of the ARTICLES in this lease are for convenience only and shall not be used to construe or interpret the scope or intent of this lease or in any way affect the same.

## ARTICLE XXVII

### SURVIVAL

Section 27.1.  No termination or cancellation of this lease shall relieve either of the parties hereto from any obligations or liabilities incurred by it under this lease as of the time of such termination or cancellation.

## ARTICLE XXVIII

### SEVERABILITY

Section 28.1.  If any term or provision of this lease is held to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of any of the other terms or provisions of this lease.

## ARTICLE XXIX

### TERMS BINDING UPON SUCCESSORS AND ASSIGNS

Section 29.1.  All of the terms and provisions hereof to be performed and observed by the respective parties hereto shall be binding upon and shall inure to the benefit of their respective successors, and assigns.

37

**WITNESS** the following signatures and seals as of the date first above written.

Executed in two (2) counterparts.

POCAHONTAS DEVELOPMENT CORPORATION
By

John W. Payne
Vice President

MANALAPAN MINING COMPANY, INC.
By

Its President

38

STATE OF WEST VIRGINIA   )
                         ) To-wit:
COUNTY OF MERCER         )

I, _Beteresia J Willis_, a Notary Public of said County, do certify that John W. Payne, Vice President, who signed the writing above, dated as of January 1, 2004, for said Pocahontas Development Corporation, has this day in my said County, before me, acknowledged the said writing to be the act and deed of said Corporation.

Given under my hand and official seal this _8th_ day of _August_, 20_06_.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
BETERESIA J. WILLIS
2710 MARELLEN AVENUE
BLUEFIELD, WV 24701
My commission expires May 17, 2010

_Beteresia J Willis_
Notary Public

My commission expires: _5-17-2010_.

STATE OF _KENTUCKY_   )
                      ) To-wit:
COUNTY OF _HARLAN_    )

I, _Susan C. Lawson_, a Notary Public of said County, do certify that _Benjamin R. Bennett_, its _President_, who signed the writing above, dated as of January 1, 2004, for said Manalapan Mining Company, Inc., has this day in my said County, before me, acknowledged the said writing to be the act and deed of said Corporation.

Given under my hand and official seal this _28th_ day of _July_, 20_06_.

_Susan C. Lawson_
Notary Public

My commission expires: _5/11/09_.

This instrument prepared by Stephen M. Hopta, Attorney at Law, Bluefield, West Virginia 24701-1517.

_S. M. Hopta_

Lease\Manalapan

39

Subj:     **Manalapan Bankruptcy - Pocahontas Development - Manalapan Lease dated January 1, 2004**

Date:     8/22/2017 10:47:55 A.M. Eastern Daylight Time

From:     efjones@efjones.com

To:       jrwestenhoefer@aol.com

Jim,

As we discussed earlier in our telephone conversation, please send me the contact information for Kingdom which I believe is the party that may have an interest in the Pocahontas Development – Manalapan Mining Lease dated January 1, 2004.

I will discuss the present situation with my client and give them the  contact information for Kingdom.

Hopefully we can move this situation forward in some manner.

Should you need it all of my contact information is below.

Thanks.

E. Forrest Jones, Jr.

Jones & Associates
P.O. Box 1989
Charleston, West Virginia 25327

Tel. – 304-343-9466
Fax – 304-345-2456
efjones@efjones.com

